**E–LEARNING LLC, Grant Business Development Group, Inc., and Roger Grant and Judith Grant, d/b/a Business Development Group, Appellants**

v.

**AT & T CORP., and AT & T Services, Inc., Appellees**

No. 04–16–00291–CV

Court of Appeals of Texas, San Antonio.

Delivered and Filed: March 1, 2017

Michael G. Colvard, San Antonio, TX, for Appellants.

Heather New, Bell Nunnally & Martin, LLP, Dallas, TX, for Appellees.

Sitting: Sandee Bryan Marion, Chief Justice Karen Angelini, Justice Irene Rios, Justice

## OPINION

Opinion by: Karen Angelini, Justice

E–Learning LLC, Grant Business Development Group Inc., and Roger Grant and Judith Grant d/b/a Business Development Group (collectively, "BDG") appeal from a take-nothing judgment on their claims against AT & T Corporation and AT & T Services, Inc. (collectively "AT & T") for breach of contract, quantum meruit, breach of fiduciary duty, negligent misrepresentation, fraud, and fraud by nondisclosure. On appeal, BDG challenges the trial court's evidentiary and summary judgment rulings. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

BDG, a business principally owned and operated by Roger Grant and his wife, Judith Grant, is involved in software design, computer programming, data processing, and systems management. BDG contends it provided services to AT & T in 2013. BDG demanded payment for these services, but AT & T refused payment, claiming that it had never contracted with BDG for the services in question. In response, BDG filed the underlying suit for damages.

In its petition, BDG alleged that its business relationship with AT & T began in 2004. For the next five years, the parties' business relationship was governed by a master agreement, which established a vendor relationship that required approved statements of work and invoicing. Beginning in 2010, the parties changed the way they transacted business and BDG developed a course of dealing with AT & T. From 2010 to 2012, BDG provided goods and services to AT & T on three projects. On these projects, which BDG refers to as the Bishop projects, BDG dealt exclusively with Analisa Bishop, an AT & T employee and project manager. Each time, Bishop contacted Grant to solicit proposals from BDG without a formal agreement or work order. Bishop informed BDG of any modifications required on these projects and made decisions on behalf of AT & T. Two of these projects required AT & T to work through a third-party vendor.

BDG's petition further alleged that in April 2013 Bishop met with Grant to discuss a new project, the Interactive Applications Simulations ("IAS") project. The project called for the creation of computer applications that AT & T could use in training its employees. In May and early June of 2013, Grant, Bishop, and several other AT & T employees met to discuss the IAS project. Bishop asked Grant to

develop a proposal for the IAS project. On June 10, 2013, BDG submitted to Bishop a written proposal for the IAS project. After receiving additional feedback from Bishop, BDG amended its written proposal and submitted the amended proposal to Bishop. BDG then began to work on the project. In July and August 2013, Bishop and Grant continued to exchange emails concerning the IAS proposal.

Finally, according to BDG's petition, on September 17, 2013, Bishop sent Grant an email advising him that funding for the IAS project was not available from one of AT & T's departments. On October 9, 2013, Grant presented an invoice to AT & T for one-half the amount shown on the proposal BDG had submitted to AT & T. On October 30, 2013, Bishop and another AT & T employee called Grant to inform him that AT & T had elected to do something else internally and that AT & T would not pay the invoice because AT & T had never signed a proposal. On November 13, 2013, Grant received an email from another AT & T employee advising him that AT & T did not agree to pay for BDG's work and no contract existed. On January 29, 2014, BDG made a formal demand for payment. Again, AT & T refused payment. Based on these factual allegations, BDG asserted claims for breach of contract, quantum meruit, breach of fiduciary duty, negligent misrepresentation, fraud, and fraud by nondisclosure.

AT & T answered BDG's suit. After conducting discovery, AT & T filed a motion for traditional and no-evidence summary judgment on all of BDG's claims. AT & T attached evidence to its summary judgment motion. BDG responded to the summary judgment motion and submitted evidence in support of its response. AT & T objected to BDG's summary judgment evidence. The trial court sustained some of AT & T's objections and excluded some of

BDG's summary judgment evidence. The trial court granted AT & T's summary judgment motion and rendered judgment that BDG take nothing on its claims. BDG filed two motions for new trial, which the trial court denied. BDG then filed this appeal.

## EVIDENTIARY RULINGS

After sustaining AT & T's objections, the trial court excluded (1) Grant's affidavit; (2) a document entitled "Training Material and Service Agreement;" and (3) BDG's answers to interrogatories. On appeal, BDG contends the trial court abused its discretion in sustaining AT & T's objections to BDG's summary judgment evidence.

We review a trial court's ruling on objections to summary judgment evidence for an abuse of discretion. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998); *Doncaster v. Hernaiz*, 161 S.W.3d 594, 601 (Tex. App.–San Antonio 2005, no pet.). A trial court abuses its discretion if its ruling is arbitrary or unreasonable or without reference to any guiding rules and principles. *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).

### Grant's Affidavit

AT & T objected to Grant's affidavit, claiming it was a sham affidavit made to avoid summary judgment. BDG first argues that AT & T's objection to Grant's affidavit was deficient because it neglected to point to any statement in the affidavit directly contradicting Grant's deposition testimony. BDG fails to cite any authority to support this argument. In the absence of citations to legal authority, BDG's argument is inadequately briefed and presents nothing for our review. *See* TEX. RULE APP. P. 38.1(i) (providing that an appellant's brief "must contain a clear and concise

argument for the contentions made, with appropriate citation to authorities and to the record."); *In re Estate of Valdez*, 406 S.W.3d 228, 235 (Tex. App.–San Antonio 2013, pet. denied) (concluding issue was inadequately briefed under Rule 38.1(i) and therefore waived).

■ BDG next argues that Grant's affidavit could not be categorized as a sham affidavit because it is consistent with his deposition testimony. BDG contends that Grant's affidavit "does not contradict his deposition testimony or assert that AT & T provided formal approval of the IAS [p]roposal;" rather, Grant's affidavit "explains that AT & T's practice under the Bishop [p]rojects did not require formal written approval of a BDG [p]roposal." BDG further contends that "no substantive differences can be found and no direct contradictions or even significant variations of degree exist."

■ When a summary judgment affidavit is executed after a witness's deposition and there is a clear contradiction on a material point without an explanation for the change, the affidavit merely creates a sham fact issue. *First State Bank of Mesquite v. Bellinger & Dewolf, LLP*, 342 S.W.3d 142, 147–48 (Tex. App.–El Paso 2011, no pet.) (holding trial court could have concluded affidavit was a sham when witness stated in his deposition that a lending decision had already been made by 2/11/04, but stated in his affidavit that it was made after 2/11/04); *Pando v. Sw. Convenience Stores, L.L.C.*, 242 S.W.3d 76, 79–80 (Tex. App.–Eastland 2007, no pet.) (holding trial court could have concluded affidavit was a sham when the party stated in his deposition that he showed no signs of intoxication, but stated in his affidavit that he was slurring his words, had bloodshot eyes, and was staggering); *Farroux v. Denny's Rest., Inc.*, 962 S.W.2d 108, 111 (Tex. App.–Houston [1st Dist.] 1997, no

pet.) (concluding affidavit was a sham when the party stated in his deposition that a doctor did not tell him why he was ill and that he did not remember any doctor telling him that the food he ate at the restaurant made him ill, but said in his affidavit that his doctor told him his illness was food poisoning).

■ In determining whether a witness's affidavit creates a sham fact issue, courts examine the nature and extent of the differences of the facts asserted in the deposition and the affidavit. *Cantu v. Peacher*, 53 S.W.3d 5, 10 (Tex. App.–San Antonio 2001, pet. denied). "If the differences fall into the category of variations on a theme, consistent in the major allegations but with some variances of detail, this is grounds for impeachment, and not a vitiation of the later filed document." *Id.* at 10. "If, on the other hand, the subsequent affidavit clearly contradicts the witness's earlier testimony involving the suit's material points, without explanation, the affidavit must be disregarded and will not defeat the motion for summary judgment." *Id.* at 10–11. In making this determination, courts consider the allegations in the petition, the deposition, and the affidavit. *See id.*

In his deposition, Grant testified that when he submitted the IAS proposal to Bishop in June 2013, AT & T was not bound to accept it. In fact, Grant went on to testify in his deposition that AT & T *never* became bound to go through with the project or to accept the proposal and go through with the project. According to Grant's deposition testimony, AT & T did not accept the proposal and go through with the project, and AT & T did not agree to accept the project and for Grant to start working on it. Grant also testified that he understood that Bishop needed to obtain "buy-in" from other individuals at AT & T and that Bishop needed approval from oth-

er individuals at AT & T before she could accept any proposal for work he was going to do. Grant testified that he knew this proposal had to be approved by other individuals at AT & T just "as it always had in the past." Grant further testified that he called Bishop frequently to see if there was any "movement" on this front. In addition, Grant testified that he was hoping that Bishop would ultimately convince her superiors to approve the IAS project and to pay him for the work he was going to do. Finally, Grant testified that BDG had only completed about half of the IAS project.

In his affidavit, Grant stated that he "understood that there was a contract/agreement wherein BDG was to develop the IAS application to be used by AT & T and AT & T agreed in fact to compensate BDG for goods, development, production and services, provided by BDG in the amount of $158,000.00." Grant also stated that, as was the case for the prior Bishop projects, there was no formal approval process for the IAS proposal. Grant further stated that on the prior Bishop projects Bishop had "made all pertinent decisions on behalf of AT & T" and "all contract details and scope of work requirements and funds [had been] directed through Bishop." Additionally, in his affidavit, Grant stated that he believed that payment would be made for the services and work BDG provided on the IAS project without a formal agreement because payment had been made without such an agreement in the past. Finally, according to Grant's affidavit, BDG had "substantially performed all of its agreed upon obligations" under the parties' contract.

We now consider the nature and the extent of the differences of the facts asserted in the deposition and the affidavit. In his deposition, Grant repeatedly testified that AT & T never agreed to accept the proposal; however, in his affidavit, Grant stated that the parties had entered into a contract regarding the IAS project. In his deposition, Grant testified that he knew that the IAS proposal had to be approved by Bishop's superiors "as it always had in the past." On the other hand, in his affidavit, Grant indicated that Bishop had made all pertinent decisions on behalf of AT & T and directed contract details. In his deposition, Grant testified that payment was uncertain: Grant was hoping that Bishop would ultimately convince her superiors to approve the IAS project and to pay him for the work he was going to do. By contrast, in his affidavit, Grant stated that BDG's compensation was certain: BDG was entitled to compensation under the terms of the parties' agreement. Finally, in his deposition, Grant stated that BDG had only completed about half of the IAS project. However, in his affidavit, Grant stated that BDG had substantially performed all of its obligations on the IAS project.

We conclude that the differences between Grant's deposition testimony and his affidavit are not mere variations on a theme or variances in detail. Grant's affidavit clearly contradicted his earlier testimony on the suit's material points and the contradictions were not explained. Because Grant's affidavit contained material statements that directly contradicted his deposition testimony, we hold the trial court did not abuse its discretion in sustaining AT & T's objection and in excluding Grant's affidavit.

### Training Material and Service Agreement

■ Next, BDG argues the trial court abused its discretion in excluding the Training Material and Service Agreement attached to its summary judgment response. AT & T objected to the document because it was not relevant and because it

was not signed. The trial court sustained the objections. On appeal, BDG only challenges the relevance objection.

■ "[W]hen an appellee urges several objections to a particular piece of evidence and, on appeal, the appellant complains of its exclusion on only one of those bases, the appellant has waived that issue for appeal because he has not challenged all possible grounds for the trial court's ruling . . . ." *Cantu v. Horany*, 195 S.W.3d 867, 871 (Tex. App.–Dallas 2006, no pet.). Because BDG failed to challenge all possible grounds for the trial court's ruling on appeal, it has waived its complaint about the exclusion of the Training Material and Service Agreement.

### Answers to Interrogatories

■ BDG also argues the trial court abused its discretion in excluding BDG's answers to interrogatories, which it attached to its summary judgment response. AT & T objected to BDG's answers to interrogatories, arguing that the answers were inadmissible because BDG could not use its own discovery responses to bolster its case.

■ Answers to interrogatories may not be used as self-serving statements for the party making them. *Keever v. Hall & Northway Adver., Inc.*, 727 S.W.2d 704, 705 (Tex. App.–Dallas 1987, no writ). A party may not resort to his own answers to interrogatories to establish the existence of a genuine issue of material fact. *Llopa, Inc. v. Nagel*, 956 S.W.2d 82, 86 (Tex. App.–San Antonio 1997, pet. denied); *Worley v. Butler*, 809 S.W.2d 242, 245 (Tex. App.–Corpus Christi 1990, no writ). "Answers to interrogatories may be used only against the responding party." TEX. R. CIV. P. 197.3; *see Nagel*, 956 S.W.2d at 86.

Because BDG could not use its own answers to interrogatories to establish the existence of a material fact issue, we hold that the trial court did not abuse its discretion in sustaining AT & T's objection and in excluding BDG's answers to interrogatories.

Having found no abuse of discretion with regard to the trial court's evidentiary rulings, we will not consider Grant's affidavit, the Training Material and Service Agreement, or BDG's answers to interrogatories in reviewing the trial court's summary judgment rulings.

### SUMMARY JUDGMENT RULINGS

■ A party moving for traditional summary judgment bears the burden of showing that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). In determining whether the nonmovant raised a fact issue, we review the evidence in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). A defendant who conclusively negates a single essential element of a cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508–09 (Tex. 2010).

■ After an adequate time for discovery has passed, a party may move for summary judgment on the ground that there is no evidence on one or more essential elements of a claim on which the adverse party would have the burden of proof at trial. TEX. R. CIV. P. 166a(i). When a party moves for no-evidence summary judgment, the nonmovant has the burden to produce summary judgment evidence raising a genuine issue of material fact as to each challenged element of its cause of action. *Id.* We review no-evidence sum-

mary judgments under the same legal sufficiency standard as directed verdicts. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (2013). Under this standard, we consider the evidence in the light most favorable to the nonmovant, crediting evidence a reasonable jury could credit and disregarding contrary evidence and inferences unless a reasonable jury could not. *Id.* We sustain a no-evidence challenge when (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.*

When a party moves for summary judgment on both traditional and no-evidence grounds, we first address the no-evidence grounds. *Id.* When, as here, the trial court does not specify the grounds for its summary judgment ruling, we affirm if any of the grounds on which judgment is sought are meritorious. *Id.*

### Breach of Contract

To prevail on its breach of contract claim, BDG had to prove (1) the existence of a valid, enforceable contract between the parties; (2) that BDG performed or tendered performance on that contract; (3) that AT & T breached the contract; and (4) that BDG sustained damages as a result of the breach. *See Schuhardt Consulting Profit Sharing Plan v. Double Knobs Mountain Ranch, Inc.*, 468 S.W.3d 557, 573 (Tex. App.–San Antonio 2014, pet. denied); *Richter v. Wagner Oil Co.*, 90 S.W.3d 890, 898 (Tex. App.–San Antonio 2002, no pet.).

■ A valid, enforceable contract exists when the following elements are shown: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds on the essential terms of the contract (mutual assent); (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App.–San Antonio 1999, pet. denied); *see Loeffler v. Lytle Indep. Sch. Dist.*, 211 S.W.3d 331, 346 (Tex. App.–San Antonio 2006, pet. denied).

In its summary judgment motion, AT & T argued there was no evidence that AT & T accepted the IAS proposal and no evidence of mutual assent. Additionally, AT & T argued that the evidence conclusively negated the elements of acceptance and mutual assent.

In its pleadings, BDG alleged both express and implied contract theories to support its breach of contract claim. A contract is express when its terms have been explicitly set out by the parties. *See Wal-Mart Stores v. Lopez*, 93 S.W.3d 548, 557 (Tex. App.–Houston [14th Dist.] 2002, no pet.). A contract is implied when its terms arise from the acts and conduct of the parties. *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972). The elements of express and implied contracts are identical. *Univ. Nat'l Bank v. Ernst & Whinney*, 773 S.W.2d 707, 710 (Tex. App.–San Antonio 1989, no writ). "[T]he real difference between express contracts and those implied in fact is in the character and manner of proof required to establish them." *Haws*, 480 S.W.2d at 609. In the case of an implied contract, "the element of mutual agreement" is "inferred from the circumstances." *Id.* A meeting of the minds is implied from and evidenced by the parties' conduct and course of dealing. *Id.* Here, BDG admits in its reply brief that no express contract existed between the parties and acknowledges that the exis-

tence of a valid, enforceable contract rests solely on its implied contract theory.

BDG argues that it produced evidence to raise a fact issue as to the existence of a valid, enforceable agreement. According to BDG, the written proposal it gave to Bishop in June 2013 for the IAS project provided the basic terms of the parties' contract[1] and AT & T's acceptance of this proposal and the parties' mutual assent could be inferred from evidence concerning the parties' course of dealing.[2] In support of this argument, BDG points to evidence concerning the prior Bishop projects. BDG contends that this evidence shows that AT & T required no written approval of BDG's proposal or a statement of work on the prior Bishop projects. However, this evidence actually shows that written approval was provided on the Bishop projects. The cited evidence includes an exhibit attached to BDG's summary judgment response, which states that on each of the prior Bishop projects, "AT & T provided an e-mail or other written approval for the project." The exhibit also contains (1) an email showing that Bishop approved a statement of work on a prior proposal submitted by BDG, (2) BDG proposals for work to be performed that are signed by Bishop, and (3) a signed agreement by a third-party vendor to pay BDG for its work on an AT & T project.

In further support of its course of dealing argument, BDG contends that the summary judgment evidence shows that AT & T required no formal approval on the prior Bishop projects. Again, none of the evidence cited by BDG shows that the prior Bishop projects were undertaken

without formal approval by AT & T. Instead, the undisputed evidence shows that AT & T continued to require formal approval. In fact, Grant testified in his deposition that he "would call [Bishop] every two days or something ... and see if [there was] any—any movement or anything because I knew [the IAS proposal] had to get approved *as it always had in the past*." (emphasis added). Additionally, in emails to Bishop and other AT & T employees, Grant repeatedly expressed his understanding that the IAS proposal required approval from authorized decision-makers at AT & T. Thus, contrary to BDG's argument, the evidence shows that formal approval from AT & T was required on the IAS proposal.

Because BDG failed to produce evidence to raise a fact issue as to acceptance and mutual assent with regard to the IAS proposal, we conclude the trial court did not err in granting a no-evidence summary judgment on BDG's breach of contract claim.

But even if we were to assume for argument's sake that the trial court erred in granting summary judgment on BDG's breach of contract claim on no-evidence grounds, its ruling was proper on traditional summary judgment grounds. AT & T also argued in its summary judgment motion that it conclusively negated the element of acceptance. In support of this argument, AT & T pointed to Grant's deposition testimony in which he repeatedly admitted that AT & T never agreed to accept the IAS proposal and to go through with the project. Specifically, in his deposition Grant testified:

---

1. The IAS proposal stated that BDG would create 72 modules, scripting, video recording/editing, hosting, reporting and annual maintenance for $158,000.00, and that the entire project would be completed in 90 days or less.

2. BDG further argues that acceptance of the proposal was not required based on the parties' course of dealing.

Counsel: At the time that you submitted [the IAS proposal] as a proposal, AT & T was not bound at that point in your mind at least to accept the proposal. Yes or no?

Grant: Yes....They were not bound.

Counsel: All right. So on June 17th, 2013, AT & T was not bound to—to do anything with respect to the IAS proposal, right?

Grant: Correct.

Counsel: At what point in time to your mind did AT & T become bound to you to go through with the project or to accept the proposal and go through with the project. At what point did that happen in your mind?

Grant: Never.

....

Counsel: At some point in your mind, you're not sure exactly when, AT & T agreed to accept the project and for you to start working on it, right?

Grant: No.

Counsel: That did not happen?

Grant: AT & T never agreed.

....

Counsel: [T]he reason why there is no scope of work is because AT & T never agreed to accept this project, right?

Grant: Correct.

Because the summary judgment evidence conclusively negated the element of acceptance, AT & T established the absence of a valid, enforceable agreement as a matter of law. We conclude the trial court did not err in granting summary judgment on BDG's breach of contract claim.

### Quantum Meruit

■■■■ BDG asserts that the trial court erred by granting summary judgment on its quantum meruit claim because the summary judgment evidence raised a fact issue on each challenged element of its claim. The essential elements of a quantum meruit claim are: (1) the plaintiffs provided valuable services or materials for the defendants; (2) the defendants accepted the services or materials; and (3) the defendants had reasonable notice that the plaintiffs expected compensation for the services or materials. *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992); *Walker & Assoc. Surveying, Inc. v. Roberts*, 306 S.W.3d 839, 859 (Tex. App.–Texarkana 2010, no pet.).

In their summary judgment motion, AT & T argued there was no evidence that BDG provided valuable services or materials for AT & T. BDG argues on appeal that it produced evidence to raise a fact issue on this element of its claim. To support its argument, BDG points to an email attached to Bishop's testimony and the deposition testimony of a BDG employee, Brandon Kent. The email, which Grant sent to Bishop and another employee, states that "a preliminary version of [a] module" had been "added to the IAS both in Flash and HTML5." The deposition testimony states that Kent did not provide an estimate of the number of hours he worked on the IAS project. This evidence fails to raise a fact issue as to whether BDG provided valuable services or materials for AT & T. We conclude the trial court did not err in granting summary judgment on BDG's quantum meruit claim.

### Breach of Fiduciary Duty

■■■ Next, BDG asserts that the trial court erred by granting summary judgment on its breach of fiduciary duty claim because the summary judgment evidence raised a fact issue on each challenged ele-

ment of this claim. The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship; (2) a breach by the defendant of his fiduciary duty to the plaintiff; and (3) an injury to the plaintiff or a benefit to the defendant as a result of the defendant's breach. *Fred Loya Ins. Agency, Inc. v. Cohen*, 446 S.W.3d 913, 919 (Tex. App.–El Paso 2014, pet. denied).

 In their summary judgment motion, AT & T argued that no evidence existed that AT & T was a fiduciary to BDG. To establish a claim for breach of fiduciary duty, BDG had to establish that AT & T was its fiduciary. *See Priddy v. Rawson*, 282 S.W.3d 588, 599 (Tex. App.–Houston [14th Dist.] 2009, pet. denied). Fiduciary relationships arise as a matter of law in some formal relationships, such as attorney-client or trustee relationships. *Meyer v. Cathey*, 167 S.W.3d 327, 330–31 (Tex. 2005). An informal fiduciary relationship may also arise from a moral, social, domestic, or purely personal relationship of trust and confidence. *Id.* at 331. However, to impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit. *Id.* Furthermore, subjective trust between parties to an arms-length transaction does not transform a business relationship into a fiduciary relationship. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997). There must be evidence that the plaintiff relied on the defendant for moral, financial, or personal support or guidance. *Lee v. Hasson*, 286 S.W.3d 1, 14–15 (Tex. App.–Houston [14th Dist.] 2007, pet. denied).

BDG argues it produced evidence to raise a fact issue as to the existence of a fiduciary relationship between it and Bishop. In support of this argument, BDG points to the relationship it developed with Bishop during the prior Bishop projects. However, this evidence fails to show that BDG's relationship with Bishop rose to the level of a fiduciary relationship. There is no evidence that BDG relied on Bishop for moral, financial, or personal support or guidance. Instead, the evidence shows that BDG's relationship with Bishop was purely a business relationship. *See Meyer*, 167 S.W.3d at 331 (concluding no informal fiduciary relationship existed between parties who had worked together on prior projects and had entered into arms-length transactions for the parties' mutual benefit). Because BDG produced no evidence that it had a fiduciary relationship with AT & T, it did not raise a fact issue on this element. We conclude the trial court did not err in granting summary judgment on BDG's breach of fiduciary duty claim.

### Negligent Misrepresentation

 BDG asserts that the trial court erred by granting summary judgment on its negligent misrepresentation claim because the summary judgment evidence raised a fact issue on the challenged elements of this claim. The elements of a negligent misrepresentation claim are: (1) the defendant made a representation to the plaintiff in the course of the defendant's business; (2) the defendant supplied false information for the guidance of others; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; (4) the plaintiff justifiably relied on the representation; and (5) the defendant's negligent misrepresentation proximately caused the plaintiff's injury. *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex. 1999).

 One of the elements AT & T challenged in its summary judgment motion was BDG's justifiable reliance on a representation made by AT & T. On appeal, BDG argues that it produced evidence to

raise a fact issue as to justifiable reliance. However, the only evidence BDG cites to support this argument is Grant's affidavit, which the trial court properly excluded from the summary judgment evidence. Therefore, BDG failed to produce evidence raising a fact issue as to whether it justifiably relied on any of the representations made by AT & T. We conclude the trial court did not err in granting summary judgment on BDG's negligent misrepresentation claim.

### *Fraud/Fraud by Nondisclosure*

On appeal, BDG asserts the trial court erred in granting no-evidence summary judgment on its fraud by nondisclosure claim because (1) AT & T's summary judgment motion failed to specifically challenge each of the factual theories alleged in its petition; and (2) the summary judgment evidence raised a fact issue on the challenged element of its fraud by nondisclosure claim.[3]

 Fraud by nondisclosure is simply a sub-category of fraud. *Schlumberger*, 959 S.W.2d at 181. The elements of fraud by nondisclosure are: (1) the defendant failed to disclose facts to the plaintiff; (2) the defendant had a duty to disclose those facts; (3) the facts were material; (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts; (5) the defendant was deliberately silent when it had a duty to speak; (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting; (7) the plaintiff relied on the defendant's nondisclosure; and (8) the plaintiff was injured as a result of acting without that knowledge. *Jackson v. NAACP Houston Branch*, No. 14-15-00507-CV, 2016 WL 4922453, at *8 (Tex.

App.–Houston [14th Dist.] 2016, pet. denied).

 We first address BDG's argument that the trial court erred in granting summary judgment on its fraud by nondisclosure claim because AT & T's summary judgment motion failed to challenge each of the factual theories alleged in BDG's petition. In its pleadings, BDG alleged nine different factual theories in support of its fraud by nondisclosure claim. For example, BDG argued that AT & T failed to disclose material facts that the IAS proposal was not approved and that Bishop was not the AT & T representative with the authority to solicit the IAS proposal. In its brief, BDG faults AT & T for "neglect[ing] to assert summary judgment claims concerning BDG's allegations set forth within item Nos. i-ix of its claims for fraud by non-disclosure . . . ." The only authority BDG cites to support this argument is Rule 166a(i) of the Texas Rules of Civil Procedure, which provides that a no-evidence summary judgment motion "must state the elements as to which there is no evidence." TEX. R. CIV. P. 166a(i). AT & T's summary judgment motion and BDG's summary judgment response show that AT & T asserted that there was no evidence to support an element of BDG's fraud by nondisclosure claim, namely, that AT & T failed to disclose material facts to BDG. We, therefore, reject BDG's argument.

We next address BDG's argument that it produced evidence raising a fact issue as to whether AT & T failed to disclose material facts. Virtually all of the evidence BDG cites to support this argument is outside of the record. The only evidence cited by BDG and included in the record consists of emails between Grant, Bishop, and another AT & T employee. BDG argues the emails raise a fact issue as to whether AT & T

---

**3.** We note that BDG does not present a separate argument concerning its fraud claim.

falsely advised BDG of a requirement to obtain competitive bids on the IAS project when internal AT & T approval had not been provided and no competitive bids were actually sought. Again, we reject BDG's argument. The cited evidence merely states that BDG had provided sufficient information for AT & T to make any comparisons and that Bishop had not had a chance to find another vendor. It does not raise a fact issue as to whether AT & T failed to disclose material facts to BDG concerning the competitive bid process. We conclude the trial court did not err in granting summary judgment on BDG's fraud by nondisclosure claim.

## MOTIONS FOR NEW TRIAL

Finally, BDG challenges the trial court's rulings denying its motions for new trial. However, BDG merely incorporates by reference other sections of its brief and fails to present any independent argument to support this issue. Because our opinion already addresses the other arguments presented in BDG's brief, we summarily overrule BDG's issue challenging the denials of its motions for new trial.

## CONCLUSION

The judgment of the trial court is affirmed.